My name is Larry Bombach. I am counsel for the appellate Eric Rund. Mr. Rund worked for over 20 years at the same job for several employers. During the course of that time, he suffered a knee injury, which resulted in a knee replacement surgery, from which he recuperated and rejoined his company on light duty, and then, ultimately, over the last six months of his employment, he worked his entire job without restriction, without accommodation. Sometime during that period, that last period of his work, somebody came up with his workers' comp doctor's restrictions and decided that they needed to ask him, Mr. Rund, that is, about accommodations. And Mr. Rund was then asked to engage in some interactive process with his employer about accommodations. Mr. Rund is not a sophisticated man. He's a worker. He works out in the fields doing his specialty. So he participated in that, even though he personally believed that he didn't need any limitations, although when this case was filed, he did say that he couldn't climb poles with gaff hooks, which nobody really took seriously because nobody did, other than rarely. Now, did ñ let me just ask about that. He said it was just climbing poles, and Charter believed he was incapable of crawling, squatting, lifting climbing ladders, and walking on uneven surfaces. Is there any evidence anywhere in the record that Charter was ever specifically told that Mr. Rund was able to crawl, squat, lift climbing ladders, and walk on uneven surfaces? I couldn't find it in the record. He specifically told them that he could do those things. That was what puzzled me about this case, is that this is not an issue of somebody being ñ telling them. He was showing them for six months. He did these jobs. He did everything that his job requirements required him to do physically for six months, and then he was told, hey, you've got these restrictions. He said, I don't have restrictions. I thought his doctor had given him restrictions and said he had permanent disability. His doctor said that he probably should have these restrictions, but he said that in December 1 of 03. They didn't fire him until September 9 of 04, and in the interim he worked for six months. On light duty? No. He worked full duty. He worked his full job. The evidence shows that. Well, the evidence showed that his fellow employees covered for him on things that he didn't feel comfortable doing. That happened while he was on light duty after his surgery, but for the last six months his testimony was that he worked his full job. And he, at the end of his term, he was never told that if you don't get these restrictions lifted, you're going to lose your job. He was told that he needed to engage in some kind of a negotiation with his employer. So he said, I need to use the bucket truck. And they said that the bucket truck wasn't available, yet his immediate supervisor said that he used the bucket truck. Didn't he ask for light duty and accommodations for his, quote, disability? Are you saying that's only with reference to his knee? Well, his disability was the only disability that's been proven in this case is that he had knee surgery. All right. But didn't he ask for light duty? Yes. The doctor recommended that he be on light duty after he recuperated from his knee surgery. He first of all had the surgery, and it was a work-related injury, and then he went back to work on light duty for a period of time, and then he resumed his full duties without restriction or without accommodation. And at that point, that's why that's what makes this case different than some of the normal cases where the employee initiates the activity of asking for accommodation. In this case, they, the employer, initiated it after getting this doctor's report. As we indicated in the... Excuse me. After the doctor's reports came in, did he say, oh, but I'm really able to do everything? You're saying he did it by his actions, by... Yes. But he never reported that I'm well, I can do everything? Well, I believe that by actions in doing his job, that was better than saying he could do it. That troubles me. He still had, what was the information that the employer had was that he had these restrictions. Is that right or wrong? I think that's wrong, because I think what the information was what they had in front of their eyes, that they had an employee who was doing his job. No, you see, we've all been around a long time, and we've seen a lot of cases where people in the workers' comp or social security context where people work when they shouldn't be, and they wind up having all kinds of problems. So if an employer has some kind of notice that a worker, that an employee has some restrictions and shouldn't be doing certain things, the employer has a good reason, I would think. I'm just asking, maybe you disagree, to want to abide by those restrictions and not have the worker continue working on a – in a capacity that might injure him. Well, I would view it from this perspective. Yes. If the employer has before him a report that indicates there are restrictions and that report is nine months old. What's the date of the last report? December 1, 2003. And the date of the firing was September 9, 2004. I thought there was a letter after that. I'm not familiar with any letters after that. But even – let's assume that Justice Reinhart is correct and that there was another letter. I think the statement by Justice Souter in USA v. at Chazabal, which we cited on page 12 of our opening brief, in which he said that the decision must be based on reasonable medical judgment that relies on the most current medical knowledge. Now, in a lot of these employment cases that I've cited and that we've all read, there is some effort on the employer's part to do a recent medical evaluation before they terminate an employment of over 20 years. They didn't do that in this case. In fact, they based it upon not only the fact that he'd had knee surgery and that he had those limitations, but that he had some mystical back ailment about which they had no medical evidence and about which the foreman testified. Now, you said the last letter was what case? The one I have in my head was that it was December 1, was the doctor's report about his medical condition and his – There seems to be another in June of 2004 saying that his restrictions would probably be permanent. Probably? Yes. Okay. I'm not familiar with that. Okay. And then there was never another note from the doctor. Between June and September when he was fired. No. Right. Okay. I'll accept that. It doesn't satisfy the requirement of the employer here to conduct any kind of medical inquiry. And in this case – Well, you don't have to conduct a medical inquiry if the employer's doctor – if the employee's doctor tells you that he's unable to work and the employee doesn't disagree with that. Why would you have to conduct a further inquiry? Well, I suppose I consider the actions of the employee. Why did the employee say, I can work? Never said it. Because the employee was told he needed to engage in an interactive process with his employer and come up with some reasons why he couldn't climb – what would accommodate him from climbing poles with gaffs. Because he never was asked about all the other things that they used to justify, such as his back injury and not being able to crawl under spaces in homes when he ran cable under the houses. Well, I don't understand how the employee submits a letter from a doctor and several letters, which end with the doctor saying that it's going to be – likely going to be permanent, but he's still not able to work and likely to be permanent. And the employee never says anything to the contrary. Why a company can't assume that's the case? Because in the case we cited, Jelfo v. Lockheed, the court said that under FEHA, regardless – that medical reports alone are insufficient to justify the employer's decision, that they need to – I mean, it says the employee's medical reports are insufficient. Yeah, because the standard in workers' compensation cases may be different than whether or not the employee can perform the essential functions of his job or whether he can even do his job. Okay. I think – Go ahead. Sorry. How does this go? Do you have a question? No, that's all right. If there are no other questions, I'll reserve my time to –  Thank you. Good morning, Your Honors. My name is Jennifer McCarty.  I'm here in support of the trial court's Brandon Steadfield appearing for Charter Communications. And I would just like to begin by stating that I believe the trial court's well-reasoned and thorough opinion is correct, and I believe that the eight causes of action asserted against Charter were correctly adjudicated in Charter's favor. And I think that the court has picked up some of the pertinent issues in this case. Charter – Mr. Rund went out for knee replacement surgery in May of 2003. He took a five-month leave of absence. In October of 2003, he came back to work. He testified that everyone at Charter welcomed him back. They gave him no problems returning to work. At that time, he submitted a doctor's note prescribing very significant restrictions in connection with his employment. He was precluded from kneeling, bending, squatting, climbing poles, and climbing ladders, and walking on uneven surfaces. Mr. Rund worked as a system technician, meaning that he installed cable at homes and commercial facilities. He admitted in his deposition he had to constantly climb ladders, constantly climb on roofs, constantly go underneath homes into crawl spaces to install cable lines, which repeatedly caused him to bend, squat, and kneel. The prescriptions that were prescribed by Mr. Rund's doctor in October of 2003, not only were they never lifted, they were reinstated on two different occasions, in January of 2004 and in June of 2004. And in both of those doctor's notes, not only did those restrictions remain in effect, the doctor said these are likely to be permanent. And in the doctor's note on June 21, 2004, that was after Mr. Rund had already engaged in the interactive process with Charter. He was already on notice that the company could no longer give him modified light-duty work. And the doctor said in that note that it appears Charter can no longer provide you with modified light-duty work. In light of that, we recommend that Mr. Rund get vocational rehabilitation because these restrictions are likely to be permanent. And I think it's disingenuous for Mr. Rund to argue, which he did argue on this appeal, that he wasn't even disabled. When throughout the course of litigation, his entire argument was that I was discriminated against because of my disability. That was the stance he took in response to discovery. That was his position during the depositions. And then on appeal, he said, oh, no, I'm not really disabled. I don't have a disability. I was simply just submitting doctor's notes to Charter telling them that I had a disability, telling them that I had these severe restrictions, but I didn't really have a disability, and Charter should have known that. And I think it's disingenuous for Mr. Rund to make that argument. Charter believed that Mr. Rund had a disability because he submitted three doctor's months stating that he had a disability and needed significant restrictions. And I would also like to point out to this Court that Mr. Rund's attorney has stated that they should have known he didn't have a disability because he was performing his job for six months, not on light duty. He was performing all of the functions of his job. But I will submit to this Court that there's no evidence in the record other than his testimony that he believed he was performing his job. And the evidence in the record submitted by his supervisor said that he wasn't performing his job duties. There were many occasions, well, Mr. Rund's supervisor submitted in his declaration that he had to handpick jobs that he thought Mr. Rund could perform. And he also submitted in his declaration that there were times when Mr. Rund would arrive at a work site after perhaps traveling 50 or 80 miles to get to that customer's terrain, and it was in a rural area, and Mr. Rund would get there and realize that he wasn't capable of performing that cable installation. And they would have to cancel that appointment for that customer or call out another technician. He wasn't performing his job duties. He wasn't able to perform the essential functions of his position. He was disrupting the efficient operation of the business. You know, I'm a little confused here as to which cause of action we're talking about here. To the extent that he's arguing that he could do the job and he was wrongfully terminated, is that do you understand that to be a claim rising under State law? Yes. I mean, Mr. Rund, he was terminated because he wasn't able to perform the essential functions of his position. I was just trying to ask you, I was a little curious too. I mean, both of these claims are asserted under State law. Yes. Is this a diversity case? Or was there another Federal claim in there? The case was filed in Federal court. But there's no Federal claim? No. I didn't file the lawsuit. Well, I know. I'm just wondering why we're here. No, this is a case under the Fair Employment and Housing Act. That's what I found as I read this. Both claims seem to be State law claims. They are State law claims. Is there any basis for Federal jurisdiction? Is charter communications a diverse case? There is diversity jurisdiction. And the case was originally filed. Okay. This is a diversity case. Yes. Okay. I won't take any more of the Court's time unless you have specific questions. Okay. Thank you. Thank you. Thank you. I have no further comments unless the Court has questions, other than to say that the trial court made some distinctions about whether or not Mr. Rund was regarded as disabled or whether he was, in fact, disabled. And I simply want to submit that the Fair Employment and Housing Act makes no distinction really between those two. A person is out of work whether he's regarded as disabled by his employer or whether he is, in fact, disabled if he gets fired for those reasons. And so I don't think there's any distinction in this case. And I think Mr. Rund lost his job because they thought he had a disability. He didn't think he had a disability. And there was a disconnect as to how it ended up being a firing rather than a medical inquiry as to what the nature and extent. And later on, of course, after he was fired, he came up with a doctor totally declaring him fit to go to work with no restrictions. So somewhere in that period of time, if somebody had looked, and I contend the employer had not a job to look and should have looked and didn't look, and therefore decided the case to fire him. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Nelson, Reinhardt